## AALSBURG *v.* CASHION

1. BOUNDARIES — ADJOINING LANDOWNERS — ACQUIESCENCE — EVIDENCE.

Doctrine of acquiescence *held*, not applicable to establish boundaries of adjoining lots where record failed to show that definite boundary lines had been established but only showed that both parties had used the same land.

2. SAME—ADJOINING LANDOWNERS—ACCRETED LANDS—APPORTIONMENT.

Where lake front property has been added to by accretion, and the lake has an approximate geographic center and is nearly circular in shape, the accreted land should be apportioned among the adjoining landowners by first determining the segment of the lake which includes the disputed lots, by finding the side lot line on the west side of the lake to the north closest to the disputed lots, which when drawn to the present shoreline and extended runs in a straight line to the center of the lake, and finding the side lot line on the southwest side of the lake closest to the disputed lots, and drawing a similar line, and then by dividing this segment among the adjoining landowners in direct proportion to the front footage of their respective original lots.

3. SAME—ADJOINING LANDOWNERS—ACCRETED LAND—JUDGMENT.

Judgment determining that adjoining owners of lake front lots acquiesced, and consented to an extension of their side lot lines to the 1942 shoreline, in settling their boundary lines over accreted lands, and that such lot lines should be extended to the present shoreline, *held*, improper where there was insufficient

REFERENCES FOR POINTS IN HEADNOTES

[1] 12 Am Jur 2d, Boundaries § 85.
[2] 56 Am Jur, Waters § 494.
[3] 12 Am Jur 2d. Boundaries § 85.
   56 Am Jur, Waters § 494.

evidence to support a finding of acquiescence in establishing lot lines, and where the proposed extension of lot lines would effect inequality in apportioning the accreted lands among the adjoining landowners.

Appeal from Kent, Hoffius (Stuart), J. Submitted Division 3 June 7, 1968, at Grand Rapids. (Docket No. 3,070.) Decided October 24, 1968. Rehearing denied December 19, 1968. Leave to appeal granted third-party defendants MacGregor and defendants Barnes July 3, 1969. 382 Mich 767.

Complaint by Joe Theodore Aalsburg and Margaret June Aalsburg, his wife, against William R. Cashion, Marion L. Cashion, his wife, Charles B. Barnes and Linda Barnes, his wife, and James D. MacGregor and Louise MacGregor, his wife, third-party defendants, to determine rights in accreted lands. Judgment determining that common boundary lines were to be extended over the remaining accreted lands at angles running to the imaginary center point of the lake. Plaintiffs appeal. Affirmed in part, reversed in part, and remanded for further proceedings.

*Dunn, Russell & Dunn,* for plaintiffs.

*Vander Veen, Freihofer & Cook (Donald F. Oosterhouse,* of counsel), for defendant.

*Varnum, Riddering, Wierengo & Christenson,* for third-party defendant.

HOLBROOK, J. This appeal concerns the determination of common boundary lines between adjoining lake lots on Silver lake in Kent county, Michi-

gan. The similarities of this appeal to those of
*Weisenburger* v. *Kirkwood* (1967), 7 Mich App 283,
are numerous, however the dissimilarities present
herein of fact and issue preclude memorandum
treatment.

The trial court's opinion states the facts well:[1]

---

[1] To aid in understanding the facts, the following sketch, a composite of several helpful maps, surveys, and sketches in the record, is provided:

"This suit involves accretion of land at Silver lake in Kent county, Michigan. Plaintiffs are the owners of a cottage located at the southwest portion of Silver lake on a lot 50 feet wide and 80 feet deep. Defendants Charles B. Barnes and wife are the owners by land contract of a home adjacent on the north to the plaintiffs' cottage which premises are being purchased on a land contract from defendants Cashion. The premises owned by defendants Barnes and Cashion are 60 feet wide and 100 feet deep. Third-party defendants MacGregor are the owners of a cottage adjacent on the north to the premises owned by defendants Barnes and Cashion which said premises are 60 feet wide and 100 feet deep.

"By reason of the change in water level of Silver lake substantial lands have accreted in front of or on the east of the premises owned by the parties. A dispute has arisen as to the use and occupation of said accreted lands and plaintiffs seek to restrain defendants Barnes from interfering with their use of a proportionate share of the accreted land.

"Defendants Cashion are not represented and have not been defaulted as they are the land contract vendors. Defendants Barnes as land contract vendees have filed answer to plaintiffs' complaint seeking to have the court determine the boundary line between their premises and the lands owned by the plaintiffs herein and have filed counterclaim claiming that they are entitled to the lands between their premises and the water by extending the side lot lines and that they have adverse possession thereof.

"Defendants Barnes have also filed third-party complaint against third-party defendants MacGregor seeking to have this court determine the property lines between the premises owned by the third-party plaintiffs and the third-party defendants. Third-party defendants MacGregor have filed answer and affirmative defenses claiming that they have had

adverse possession and by acquiescence they are entitled to the premises between their lands and the water's edge with the side lot lines extended.

"The pleadings frame the issues to be tried by the court and it is necessary for this court to determine two property lines, namely, between plaintiffs' and defendants Barnes' premises, and between defendants Barnes' premises and third-party defendants MacGregors' premises.

"In order to better understand the situation now existing it is necessary to review the history of these lands. All three of these premises have cottages or homes on them and the lands are located in the southwest portion of Silver lake. The lots run in a generally east-west direction with the plaintiffs' premises being 20 feet shorter than the other parties' premises. The premises to the south of plaintiffs' premises run in a generally northeasterly-southwesterly direction instead of a due east-and-west direction. There has been a substantial accretion of land of approximately 150 to 200 feet in front of the parties' premises. All parties claim from a common grantor, namely, Howard M. Weller. The court took testimony from old residents of the area which indicated that in front of the parties' three premises there had formerly been a lagoon or bayou with an indefinite and irregular shoreline that subsequently as the lake receded this area became solid enough to become a portion of the beach, that it varied from year to year and that in 1942 the lands were substantially higher than they had been in 1941.

"The testimony further reflected at various times the water was within 40 or 50 feet of the front lot lines of plaintiffs' and defendants' houses. In 1925 the former common owner of these premises executed an agreement which was recorded in 1926 which purported to convey to the 'present respective owners of said lots whatever land, if any there be, located immediately between each of said lots and the shore or water line of said Silver lake so that

each of the respective present owners of said lots or parcels of land, their heirs and assigns shall own and have title to any and all land located immediately between the front line and projected side lines of said lots and said Silver lake.'

"This said instrument also purported to convey all 'riparian and shore rights' but further provided that land not exceeding four feet in width along the shore of the lake should be used in common as a walk. At the time of the recording of this instrument Mr. Weller was no longer the owner of the premises owned by the parties hereto. Neither was there any clear showing as to the location of the water's edge at the time of this purported conveyance.

"Gradually as lands accreted in front of the premises here involved and the premises south of plaintiffs' premises question arose as to the ownership of the accreted lands. On May 3, 1945, the Kent county surveyor's office prepared a survey of the three premises immediately adjacent on the south to the plaintiffs' premises. These are the lots which run in a generally northeasterly and southwesterly direction. At that time it appears that there was approximately 200 feet between the front lot line and the water's edge of those three premises. The survey, instead of extending the side lot lines to the water's edge, established a different course. Testimony taken at the trial indicated that the survey extended the side lot lines to the imaginary center of the lake so that the directions of the extended lines are in varying degrees from those established by the side lot lines. They run at approximately a 20-degree variance from the side lot line.

"Testimony was taken from the former owner of plaintiffs' premises who stated that as a result of the above survey he had his premises surveyed by the Kent county surveyor's office in 1946. The survey was received into evidence as exhibit 3 and indi-

cates again the extension from plaintiffs' premises to the imaginary center point of Silver lake. The projected line is at approximately a 24-degree variance from the side lot line and causes the land between the front of plaintiffs' premises and the water's edge to be in a generally northeasterly-southwesterly direction at approximately the same angle as the extended lines on the survey for the premises to the south.

"There is a conflict as to the use of the lands in front of the parties' premises. It appears that over the years when the neighbors were friendly and cooperative there was some joint use of a substantial portion of the beach. At various times certain of the owners even had a common dock and common diving raft. At another time it appears there was a concerted effort by the three parties here involved not to use premises to the south of plaintiffs' premises but generally the premises south of the plaintiffs' premises utilized the beach in a manner consistent with the 1945 survey which was received in evidence as exhibit 7. One of the owners established a tennis court on this area and a concrete dock. The general effect of accepting this 1945 survey (exhibit 7) is that all adjacent property owners received a proportionate share of the beach. The result of the acceptance by the parties of the premises to the south has been that the Aalsburg and Barnes premises have utilized over the years substantially less than their proportionate share of the beach based upon the width of their lots."

From the above difficult and complicated factual situation the trial court determined that up through 1942 the parties acquiesced, used and consented to an extension of their side lot lines in setting common boundaries over accreted lands. In addition, the trial court determined that from the extension of their side lot lines to the 1942 shoreline, the parties' common boundary lines were to be extended over

the remaining accreted lands at angles running to "the imaginary center point" of Silver lake.

Plaintiffs have appealed the trial court's determination asserting the trial court's use of the 1942 shoreline was improper and that the 1925 shoreline, as testified to by Joe Cavera, be used in determining the property line between Aalsburg and Barnes. Further that the 1916 shoreline be used in determining the property line between the MacGregors' and Barnes' properties or a just and proportionate division of the shoreline be made between the 3 disputing property owners by extending the north side lot line of MacGregors' property to the lake and by extending the south side lot line of Aalsburg to the lake.

Defendants indicate a general satisfaction with the trial court's determination. They indicate that the 1946 shoreline should have been used by the trial court instead of the 1942 shoreline.

After a careful reading of the transcript, we conclude that there was insufficient evidence presented to permit a finding of acquiescence as to the common side lot lines extended to the 1942 shoreline. See *Weisenburger* v. *Kirkwood, supra.* The trial court's finding would suppose acquiescence by Aalsburgs' predecessors from 1926 to 1942 to use and possession of almost one-half of Aalsburgs' 1942 or 1946 shoreline by Barnes' predecessors. The testimony shows no definite established boundary lines but only a "live and let live" course of conduct, *i.e.,* both parties using the same land from time to time during those years as well as during the following years until the 1960's.

The 1925 Weller conveyance conveyed to the then owners of the previously deeded lake lots riparian rights to Silver lake in the following manner:

"Now therefore, said Howard M. Weller for and in consideration of the sum of one dollar and other good and valuable considerations to him paid by each of the present owners of said lots or parcels of land heretofore sold by said Howard M. Weller and wife or by said Howard M. Weller, a widower, as above mentioned, the receipt of which considerations is hereby confessed and acknowledged, does hereby grant, bargain, sell and convey to each of said present owners of said lots or parcels of land, their heirs and assigns, that certain piece, parcel or strip of land located immediately between each of said lots or parcels of land respectively as described in the original deeds or conveyances from said Howard M. Weller and wife of said Howard M. Weller, a widower, and the shore or water line of said Silver lake together with all riparian and shore rights; all said lands being located in the southeast fractional one-fourth of section 9, Cannon township, Kent county, Michigan.

"It being the intent of said Howard M. Weller to hereby grant, bargain, sell and convey to each of the present respective owners of said lots or parcels of land heretofore purchased from himself and wife or himself as a widower, their heirs and assigns whatever land if any there be, located immediately between each of said lots and the shore or water line of said Silver lake so that each of the respective present owners of said lots or parcels of land, their heirs and assigns shall own and have title to any and all land located immediately between the front line and projected side lines of said lots and said Silver lake."

This conveyance related back to the original conveyances for the respective lake lots.

The lowering of the lake level has brought about a condition of reduced lake shoreline. Prior to this suit there arose a dispute as to how the remaining lake shoreline was to be shared by the parties

herein. The establishment of the geographic center of Silver lake by the trial court has been accepted by the parties herein for all practical purposes.

The method of allocating accreted shorelands was stated in *Weisenburger* v. *Kirkwood, supra.* Herein a modification of that rule is available because the parties recognize an approximate geographic center of Silver lake and because the lake is nearly circular in shape. The present shoreline in this case can be properly divided by finding the side lot line on the west side of the lake to the north closest to the disputed properties which when drawn to the present shoreline and extended runs in a straight line to the center of the lake, and finding the side lot line on the southwest side of the lake closest to the disputed properties and drawing a similar line. These lines define a segment of the lakeshore which includes the disputed lots. The present shoreline that is in this segment is to be divided amongst the property owners therein in direct proportion to the front footage of their respective original lots, *i.e.,* in the event the present shoreline is 1/3 less than the total segment original lot frontage, a 60 foot lot would have 40 feet of shoreline, a 75 foot lot, 50 feet of shoreline, etc.

By following this rule the intent of the common grantor, H. M. Weller, can be effected with resulting equity to every riparian owner involved.[2]

The trial judge determined in his decision only the common lot line between the Barnes' and MacGregors' properties and the common lot line between the Barnes' and Aalsburgs' properties. The rule herein enunciated is only to be applied to ascertain the

[2] To literally follow the suggested extension of the side lot lines of the lake lots to the lakeshore would effect many inequalities; *i.e.,* because of the irregularly shaped lots, some of the lot owners would have no reduction in lake shoreline, some would have greatly reduced lake shoreline and still others would have no lake shoreline at all.

same common lot lines because the parties to the north of MacGregor and to the south of Aalsburg are not parties to this suit and such lot lines are subject to claims of adverse possession or settlement by acquiescence.

Affirmed in part and reversed in part and remanded for further proceedings including the taking of additional testimony if necessary, and the entry of a judgment not inconsistent with this opinion.

McGREGOR, P. J., and C. KAUFMAN, J., concurred.

### ORDER DENYING REHEARING

In this cause an application for rehearing together with a brief in support thereof is filed by third party defendants-appellees, MacGregor, and an answer and brief in opposition thereto having been filed by plaintiffs-appellants, Aalsburg, and a motion for leave to file delayed application for rehearing together with a brief in support thereof having been filed by defendants-appellees, Barnes, and due consideration thereof being given by this Court by dealing with the 3 stated grounds for rehearing as asserted by third party defendants-appellees, MacGregor, *viz:*

1. The method of allocation of the lakeshore adopted by the Court was not pleaded or proposed by any party and the issues with respect thereto were not tried, briefed or argued.

a. GCR 1963, 801.1 provides for the "method of review" by the Court of Appeals and states in part:

"This rule refers only to the method of review and does not restrict, enlarge or change the right or scope of review provided by law except as explicitly set out in these rules."

b. 5 CJS, Appeal & Error, § 1462(a) states in part:

"The appellate court may weigh the evidence in equity cases in which it has all the evidence before it, and the competent evidence will be considered, and this without reference to the ruling of the lower court thereon."

*Maginn* v. *Cashin* (1917), 196 Mich 221 is given as support for the last clause.

c. 5B CJS, Appeal & Error, § 1874(a) states in part:

"On appeals in equity cases, as shown *supra*, § 1462, the higher court has somewhat broader powers of review than on appeals in actions at law tried before a jury, and further it generally has the benefit of findings of fact made by the trial court. Accordingly, on such an appeal, where the court can see from the record what the rights of the parties are, it not only has the power to render such a decree as ought to have been rendered below, without remanding the case, but it is also held to be its duty to do so; and in such jurisdictions it is the invariable practice to render final judgment, and not remand the case for further proceedings, but in other jurisdictions such practice apparently does not obtain. The modification of a decree amounts, generally, to an affirmance and specified exceptions."

d. And 5B CJS, Appeal & Error, § 1835(b) states in part:

"In a proper case and for a sufficient reason the court, on appeal in an equity or chancery case, may remand the case to the court below for further proceedings therein, in accordance with the opinion of the court."

Where the Court of Appeals is reviewing an action involving equitable matters and has before it

all the evidence, it may modify or change the trial
court's decree and may remand for further pro-
ceedings not inconsistent with its determination on
appeal.

i. There is no need for testimony, briefing or argu-
ment on the equitable "method of allocation" deter-
mined by the Court of Appeals.

ii. There is no need for testimony or argument
on the side lot lines in determining the points of
beginning in applying the equitable "method of
allocation;" if there is, such might be made within
the scope of remand to the trial court.

iii. The parties sought equitable settlement and
they have received it—there is no basis now for
complaint because they may have received some-
thing or lost something they didn't specifically de-
sire.

2. The Court failed to determine third party de-
fendants' MacGregors' claim of title by adverse
possession of the property between his side lot lines
extending to the 1946 shoreline, although the evi-
dence in support of said claim is substantially un-
disputed.

The trial court considered the issues of both ad-
verse possession and acquiescence and found ac-
quiescence. This Court in reviewing the evidence
stated:

"The testimony shows no definite established
boundary lines but only a 'live and let live' course
of conduct, *i.e.*, both parties using the same land
from time to time during those years as well as
during the following years until the 1960's."

This conclusion precludes any finding of adverse
possession.

3. The decision of the Court goes beyond the
pleadings and in particular grants relief against

third party defendants that was not pleaded or demanded in the third party complaint.

a. The relief requested by third party defendants (Barnes) in their complaint asks that:

"The court also determine the north boundary of defendants' property to be the line drawn from the northeast corner of said metes and bounds description to the center of Silver Lake."

The request for relief and the equitable "method of allocation" propounded by the Court of Appeals are not totally opposite. Third party defendants could not foresee what relief might be forthcoming and protected itself by stating the pleaded request. The relief given is equitable, and does not extend beyond the scope of the pleadings.

This Court confined itself as did the trial court to determining the common lot lines between the Barnes' and MacGregors' properties and the Barnes' and Aalsburgs' properties; and is in accord with relief requested by all parties to this action.

It is ordered that the application for rehearing of defendants-appellees MacGregor be, and the same is hereby denied, for lack of merit in the grounds presented;

It is further ordered that the motion for leave to file delayed application for rehearing of defendants-appellees Barnes be, and the same is hereby denied for lack of merit in the grounds presented.

This order has taken into consideration all the supplemental pleadings filed subsequent to the issuance of the opinion of this Court.